UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAN D.,[1]

                                        Plaintiff,

v.

KILOLO KIJAKAZI, Commissioner of
Social Security,

                                        Defendant.

Case No.:  21cv1403-LR

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT, DENYING
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT, AND
REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS**

**[ECF NOS. 13, 14]**

On August 5, 2021, Jan D. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C.
§ 405(g) seeking judicial review of a decision by the Commissioner of Social Security
("Defendant") denying Plaintiff's application for social security disability benefits.  (ECF
No. 1.)  Now pending before the Court is Plaintiff's Motion for Summary Judgment,
Defendant's Cross-Motion for Summary Judgment, Defendant's Opposition to Plaintiff's

---

[1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), the Court's opinions in Social Security cases filed under
42 U.S.C. § 405(g) "refer to any non-government parties by using only their first name and last initial."

1  Motion for Summary Judgment, and Plaintiff's Opposition to Defendant's Cross-Motion.

2  (ECF Nos. 13, 14, 15.)  For the reasons discussed below, the Court **GRANTS** Plaintiff's

3  Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary

4  Judgment, and remands the case for further administrative proceedings.

5  ## I. PROCEDURAL BACKGROUND

6  On January 23, 2017, Plaintiff filed an application for disability insurance benefits

7  under Title II of the Social Security Act alleging disability beginning on May 26, 2016.

8  (ECF Nos. 10 & 11 ("AR")[2] at 102.)  After her application was denied initially and upon

9  reconsideration, (id. at 101–64), Plaintiff requested an administrative hearing before an

10 administrative law judge ("ALJ"), (id. at 180–81).  Administrative hearings were held on

11 July 30, 2020, and September 1, 2020.[3]  (Id. at 36–100.)  Plaintiff appeared at the

12 hearings with counsel, and testimony was taken from her and a vocational expert ("VE").

13 (See id.)

14 As reflected in his November 27, 2020, hearing decision, the ALJ found that

15 Plaintiff had not been under a disability, as defined in the Social Security Act, from

16 May 26, 2016, through the date last insured, March 31, 2017.  (Id. at 29.)  The ALJ's

17 decision became the final decision of the Commissioner on June 8, 2021, when the

18 appeals council denied Plaintiff's request for review.  (Id. at 1–5.)  This timely civil

19 action followed.  (See ECF No. 1.)

20 / / /

21

22

23 [2]  "AR" refers to the Administrative Record filed on June 2, 2022.  (ECF Nos. 10 & 11.)  The Court's
   citations to the AR in this Order are to the page numbers listed on the original document rather than the
24 page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF").
   For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

25

26 [3]  The Court notes that there were two administrative hearings in this case.  Both hearings were held
   telephonically due to Covid-19 pandemic.  During the first hearing on July 30, 2020, the ALJ ran out of
27 time because he had a scheduling hearing in a different case, and required additional time to allow
   Plaintiff to finish her testimony and to hear the VE's testimony.  (AR at 70, 98–99.)  The second hearing
28 was held on September 1, 2020, during which Plaintiff finished her testimony, and the VE testified and
   was questioned by the ALJ.  (Id. at 25, 37–68.)

21cv1403-LR

## II.  SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date.  (AR at 18.)  At step two, the ALJ found that Plaintiff had the following severe impairments: bilateral knee osteoarthritis; bilateral shoulder tendinitis and labral tears, status post arthroscopic surgeries; incipient degenerative disc disease affecting primarily cervical spine; bronchitis; asthma; and history of pneumonia with pleural effusion.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 22.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to do the following:

> perform sedentary work as defined in 20 CFR 404.1567(a) except: The claimant could stand and/or walk for up to two hours per day and can sit for up to seven hours per day.  She could occasionally climb ramps, stairs, or ladders; but never climb ropes or scaffolding.  The claimant could occasionally balance, stoop, kneel, crouch, or crawl.  She could perform no more than occasional overhead reaching bilaterally.  The claimant could perform frequent reaching in other directions and frequent fingering or feeling bilaterally.  She should avoid concentrated exposure to dust, odors, fumes, or pulmonary irritants.  The claimant should not work at unprotected heights.

(Id. at 23.)

At step four, the ALJ found that Plaintiff could perform past relevant work as a receptionist.  (Id. at 28.)  The ALJ then found that Plaintiff was not disabled.  (Id.)

/ / /

/ / /

/ / /

/ / /

### III.  ISSUES IN DISPUTE

As set forth in the parties' moving and responding papers, the disputed issues are as follows:

1.  Whether the ALJ erred by failing to evaluate the opinion evidence from Drs. Lane, Tallman, and Hansen, as required by the regulations, Agency policy, and  Ninth Circuit precedent.  (ECF No. 13-1 ("Pl.'s Mot.") at 3, 17–28; ECF No. 14 ("Def.'s Mot.") at 9–14.)

2.  Whether the ALJ erred by discounting Plaintiff's subjective symptom testimony because the ALJ failed to specifically consider Plaintiff's work history.  (Pl.'s Mot. at 3, 28–30; Def.'s Mot. at 14–17.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [the court's] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the

ALJ on a ground upon which [he or she] did not rely."  Revels, 874 F.3d at 654 (internal quotation omitted).

## V.  RELEVANT MEDICAL RECORDS AND TESTIMONY

### A.  Dr. Tallman

Between April 2016 and April 2018, Plaintiff's treating orthopedist, Dr. Tallman, examined Plaintiff and completed "Workers' Compensation Orthopedic Consultation Report[s]."  On April 18, 2016, Dr. Tallman, reported that Plaintiff's cervical exam revealed mild loss of mobility and neck pain, but no radiation into the shoulders or extremities.  (AR at 1129.)  Plaintiff's diagnoses were "[c]hronic cervical strain with spondylosis and stenosis," "[r]ight shoulder impingement . . . rotator cuff tendinosis and bursal surface partial tear," and "[l]eft shoulder impingement . . . [with a] small partial interstitial tear."  (Id. at 1784.)  Dr. Tallman also wrote that Plaintiff "can continue full work duty at this time."  (Id. at 1129.)

On May 11, 2016, Dr. Tallman wrote that Plaintiff "may do modified work" until May 16, 2016, the day of her next appointment, that she could perform "limited overhead work," and lift only 10 pounds.  (Id. at 1785.)  On May 16, 2016, Dr. Tallman reported that Plaintiff had axial neck pain due to positive Spurling's test,[4] but no upper extremity radicular complaints.  (Id. at 1123.)  He also found tenderness in Plaintiff's left and right shoulder rotator cuff insertions.  (Id.)  Dr. Tallman listed the following diagnoses: "[c]hronic cervical strain with spondylosis and stenosis," "[r]ight shoulder impingement . . . rotator cuff tendinosis and . . . [a] partial tear," and "[l]eft shoulder impingement . . . with supraspinatus tendinosis and small partial interstitial tear."  (Id. at 1124.)  Plaintiff's

---

[4]  A Spurling's test is a "passive cervical extension with rotation to the affected side and axial compression.  The test is considered positive when radicular pain is reproduced."  See https://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited on August 3, 2023).

work status was "[m]odified duty with no lifting or carrying greater than 10 pounds and limited overhead work." (Id.)

On June 24, 2016, Dr. Tallman reported that Plaintiff's cervical spine was tender, but otherwise she had good mobility with a negative Spurling's test. (Id. at 1121.) Plaintiff's diagnoses were "[c]hronic cervical strain, spondylosis with stenosis," "[r]ight shoulder partial rotator cuff tear with tendinosis and impingement," and "[l]eft shoulder rotator cuff tendinosis [and] small partial rotator cuff tear with impingement." (Id.)

On July 6, 2016, Dr. Tallman reported that Plaintiff's cervical spine showed no palpable spasms, a non-tender acromioclavicular joint, no radiating symptoms, intact sensation in upper extremities, and good strength distally with axial pain from Spurling's test. (Id. at 1118.) He listed the following diagnoses: "[c]hronic cervical strain with spondylosis and stenosis," "[r]ight shoulder rotator cuff tendinosis with partial rotator cuff tear tendonitis with impingement and limited mobility," and "[l]eft shoulder rotator cuff tendinosis, small partial tear supraspinatus with impingement and limited mobility." (Id. at 1119.)

On August 3, 2016, Dr. Tallman reported that Plaintiff's cervical spine had tender paraspinals, mild limitation, and tender rotator cuff insertions. (Id. at 1117.) Plaintiff's diagnoses were "[c]hronic cervical strain, spondylosis with stenosis," "[r]ight shoulder rotator cuff tendinosis with partial rotator cuff tear impingement and limited mobility," and "[l]eft shoulder rotator cuff tendinosis, small partial tear supraspinatus with impingement and limited mobility and weakness." (Id.) Dr. Tallman also noted that Plaintiff's work status was "TTD [temporarily totally disabled] until follow-up." (Id.)

On August 4, 2016, Dr. Tallman performed a left shoulder arthroscopy with "debridement of labral tearing and partial subscapularis and infraspinatus tear, subacromial decompression with release of coracoacromial ligament, and arthroscopic repair of full thickness supraspinatus rotator cuff tear." (Id. at 1606.) On August 17, 2016, he reported that Plaintiff's "[c]ervical spine showe[d] trace tender paraspinals and trapezius with slight limited rotation and lateral bend," and "Spurling's maneuver

producing more axial neck pain," but "otherwise, sensory [was] intact." (Id. at 1113.)
Dr. Tallman also wrote that Plaintiff's left shoulder surgical portals were healing well,
there were no signs of infection, "no erythema, warmth, fluctuance, or drainage,"
Plaintiff had good mobility in her elbows, hands, and wrists, with good grip strength and
intact sensation, but her right shoulder rotator cuff was tender. (Id. at 1114.) Plaintiff's
diagnoses were "[c]hronic cervical strain with stenosis and bilateral upper extremity
radiculitis," and "[r]ight shoulder rotator cuff tendinosis with partial rotator cuff tear with
impingement and limited mobility." (Id.)   Her work status was "[temporarily totally
disabled] until follow-up." (Id.)

On September 14, 2016, Dr. Tallman reported that Plaintiff's cervical spine was
tender with near full extension, she had pain at end points, and her positive Spurling's
test indicated "axial neck pain and tingling bilateral hands," with all other sensation intact
with good strength. (Id. at 1110.) He also noted tender rotator cuff insertion in
Plaintiff's right shoulder. (Id. at 1111.) Dr. Tallman's diagnoses were "[c]ervical
spondylosis with stenosis . . . C4–C7, with bilateral upper extremity radiculitis," and
"[r]ight shoulder rotator cuff tendinosis, with . . . partial impingement and limited
mobility with weakness." (Id.) He wrote that Plaintiff's work status was "[temporarily
totally disabled] until follow-up." (Id.)

On October 12, 2016, Dr. Tallman reported that Plaintiff had tenderness in her
cervical spine and shoulders, limited bend rotation, and that the Spurling's test caused
axial back pain. (Id. at 1960.) He listed the following diagnoses: "[c]ervical spondylosis
with stenosis," "[b]ilateral upper extremity radiculitis," "[r]ight shoulder rotator cuff
tenodesis, partial rotator cuff tear, impingement and limited mobility and weakness," and
limited mobility and weakness in left shoulder." (Id. at 1961.) Dr. Tallman also wrote
that Plaintiff was "[temporarily totally disabled] until follow-up." (Id.)

On November 23, 2016, Dr. Tallman reported tenderness in Plaintiff's cervical
spine with limited extension and side-bending, and stated that the Spurling's maneuver
radiated to Plaintiff's scapula, shoulder, and upper arm. (Id. at 1747.) He listed the

following diagnoses: "[c]ervical spondylosis with stenosis with extremity radiculitis" and right shoulder partial rotator cuff tear with limited mobility.  (Id. at 1748.)  Dr. Tallman also stated that Plaintiff's work status was "[temporally totally disabled] until follow-up."  (Id.)

On December 27, 2016, Dr. Tallman reported that Plaintiff's cervical spine and shoulder rotator cuffs had mild tenderness.  (Id. at 1580.)  He listed the following diagnoses: "[c]ervical spondylosis with stenosis with bilateral upper extremity radiculitis, improved following cervical epidural steroid injection," and limited mobility and weakness in both shoulders.  (Id. at 1581.)

On January 24, 2017, Dr. Tallman reported tenderness in Plaintiff's spine, good flexion and extension, mild limited rotation and side-bending, and a negative Spurling's test.  (Id. at 1688.)  Plaintiff's left shoulder surgical portals were well-healed, and there was tenderness of the left and right shoulder rotator cuff insertions.  (Id. at 1688–89.)  Dr. Tallman noted improved "cervical spondylosis with stenosis and bilateral upper extremity radiculitis," improving left shoulder rotator cuff repair with limited mobility and weakness, and partial rotator cuff tears with limited mobility and weakness.  (Id. at 1689.)  Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)

On March 6, 2017, Dr. Tallman reported tenderness in Plaintiff's cervical spine, good mobility, and a negative Spurling's test.  (Id. at 1682.)  Plaintiff's left shoulder surgical ports were well-healed, and she had tenderness over the left shoulder and right shoulder rotator cuff insertions.  (Id. at 1682–83.)  Plaintiff's diagnoses were "[c]ervical spondylosis with stenosis and bilateral upper extremity radiculitis," limited mobility and weakness in right rotator cuff that was "improving," and right shoulder partial rotator cuff tear with mild limited mobility and weakness.  (Id. at 1683.)  Dr. Tallman noted that Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)  On March 22, and March 27, 2017, Dr. Tallman reported similar findings, diagnoses, and work status for Plaintiff, as he listed in his March 6, 2017 report.  (Id. at 1972–73, 1975–76.)

On April 24, 2017, Dr. Tallman reported that Plaintiff's cervical spine was tender, the Spurling's test was negative, her left shoulder showed healed surgical scars, and her right shoulder showed tenderness in the rotator cuff insertion.  (Id. at 1651.)  Dr. Tallman listed the following diagnoses: "[c]ervical spondylosis with stenosis and bilateral upper extremity radiculitis," improving left rotator cuff with limited mobility and weakness, and right shoulder partial rotator cuff tear with impingement and "limited mobility with weakness."  (Id. at 1652.)  Plaintiff's work status was "[temporality totally disabled] until follow-up."  (Id.)

On April 27, 2017, Dr. Tallman performed a right shoulder diagnostic arthroscopy.  (Id. at 1648.)  On May 11, 2017, he reported tenderness in Plaintiff's cervical paraspinals and trapezius, limited rotation and side-bend, good mobility, a negative Spurling's test, and Plaintiff's right shoulder surgical portal was healing well.  (Id. at 1661–62.)  Dr. Tallman listed the following diagnoses: "[c]ervical spondylosis with stenosis and bilateral upper extremity radiculitis," and limited mobility and weakness in left shoulder.  (Id. at 1662.)  He stated that Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)

On June 6, 2017, Dr. Tallman reported that Plaintiff's surgical scars on her shoulders were well-healed, there was tenderness on her right rotator cuff insertion and cervical spine, and minimal limitations when rotating or side-bending.  (Id. at 1658–59.)  Dr. Tallman listed the following diagnoses: "cervical spondylosis with stenosis and bilateral upper extremity radiculitis," and improving left rotator cuff.  (Id. at 1659.)  He reported Plaintiff's work status as "[temporarily totally disabled] until follow-up."  (Id.)

On July 5, 2017, Dr. Tallman reported that Plaintiff's right shoulder had some "discomfort," but her left shoulder showed "no tenderness with healed scars."  (Id. at 1640.)  He listed diagnoses of "[c]ervical spondylosis with stenosis and radiculitis," and improved left shoulder.  (Id. at 1641.)  Dr. Tallman also stated that Plaintiff's work status was "[temporarily totally disabled]."  (Id.)

On August 9, 2017, Dr. Tallman reported that Plaintiff's spine showed tenderness, the Spurling's maneuver produced axial and neck discomfort, there were "no upper extremity radicular symptoms," and sensory was "intact with good motor strength."  (Id. at 1642–43.)  Plaintiff's shoulder surgical scars were well-healed, and she had tenderness in the "anterior capsule and biceps" and in the left rotator cuff insertion.  (Id. at 1643.)  Dr. Tallman listed the following diagnoses: "[c]ervical spondylosis with stenosis and bilateral upper extremity radiculitis symptoms," improved left rotator cuff, and "limited mobility and weakness" in right shoulder.  (Id.)  Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)

On September 20, 2017, Dr. Tallman reported that Plaintiff's spine showed no deformity, but was tender, had limited extension, and the Spurling's maneuver caused tingling in Plaintiff's hands and fingertips.  (Id. at 1600–01.)  Plaintiff showed good distal strength and grip, her surgical scars were "well-healed," and she had tenderness in her left rotator cuff insertion with 5/5 strength."  (Id. at 1601.)  Dr. Tallman listed the following diagnoses: "[c]ervical spondylosis with stenosis and . . . upper extremity radiculitis," left shoulder "rotator cuff repair improv[ment]," and improved right shoulder.  (Id.)  He stated that Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)

On October 9, 2017, Dr. Tallman reported that Plaintiff had cervical spine tenderness and "positive Spurling's maneuver, producing more neck and bilateral trapezius aching pain with some tingling into the bilateral fingertips." ( Id. at 1598.)  Plaintiff's "upper extremities show[ed] sensory [wa]s intact."  (Id.)

On November 20, 2017, Dr. Tallman reported that Plaintiff's cervical spine showed tenderness, the Spurling's test caused axial neck pain with some "tingling into bilateral upper extremities," but Plaintiff's shoulder surgical scars were healed, she had good motion on the left, limited motion on the right, good rotator cuff strength, and trace tenderness in left shoulder rotator cuff insertion.  (Id. at 1593–94.)  He listed "[c]ervical spondylosis with stenosis and upper extremity radiculitis" as Plaintiff's diagnoses.  (Id. at

1594.)  Plaintiff's work status was "[temporarily totally disabled] until follow-up."  (Id.)
On November 21, 2017, Dr. Tallman reported that Plaintiff could lift no more than 10
pounds.  (Id. at 1597.)

On January 2, 2018, Dr. Tallman wrote that Plaintiff had tenderness in her cervical
spine and shoulders with limited extension and pain in endpoints.  (Id. at 1962.)  Plaintiff
had axial neck pain radiating to shoulders from the Spurling's maneuver, and her scars
from shoulder surgery were healed with only minor tenderness.  (Id.)  Plaintiff's right
shoulder showed improved motion, mild limited rotation, and good rotator cuff strength
with no impingement.  (Id.)  Plaintiff's diagnoses were "[c]ervical spondylosis with
stenosis and bilateral upper extremity radiculitis," and improved right shoulder with mild
impingement and tendinitis symptoms.  (Id. at 1963.)  Dr. Tallman stated that Plaintiff's
work status was "[temporarily totally disabled] until follow-up."  (Id.)

On February 19, 2018, Dr. Tallman reported "only mild tenderness" in Plaintiff's
cervical spine and shoulders, improved motion, and a "[n]egative Spurling's maneuver."
(Id. at 1966–67.)  Plaintiff's shoulder surgical scars were well-healed and "non-tender"
on the left shoulder with "only trace tenderness on the right," and "trace limited rotation
on the right with mild impingement," 5/5 rotator cuff strength, no pain, and "minor . . .
discomfort on the right."  (Id. at 1967.)  Dr. Tallman reported diagnoses of "[c]ervical
spondylosis with stenosis and bilateral upper extremity radiculitis symptoms improving,"
and "[m]ild impingement and tendinitis symptoms" on the right shoulder.  (Id.)  He
further stated that Plaintiff's work status allowed for "modified duties with no lifting,
carrying, pushing, or pulling of more than 10 pounds, no repetitive task[s] [sic] with the . .
. . upper extremities including limited overhead reaching and no more than two to three
hours of work without 15 minutes stretch break."  (Id.)

On April 2, 2018, Dr. Tallman reported tenderness in Plaintiff's cervical spine and
shoulders, mildly limited rotation, minimal discomfort, a negative Spurling's maneuver,
well-healed surgical scars and trace tenderness in shoulders, "clavicle on the right," 5/5

21cv1403-LR

strength "on abduction," and mild impingement sign on Hawkins' test.[5]  (Id. at 1920–22.)
Plaintiff's diagnoses were: "cervical strain with . . . mild to moderate central and
neuroforaminal stenosis and radiculopathy," left shoulder "debridement of rotator cuff
and labral tears," and right shoulder "debridement of rotator cuff and labral tears."  (Id. at
1922.)  Dr. Tallman stated that Plaintiff was precluded from "repetitive reaching or
overhead use of bilateral arms, including lifting, carrying, pushing or pulling more than
10 pounds," and "any repetitive neck motion."  (Id.)

**B.   Dr. Lane**

On February 26, 2018, Dr. Lane, a consultative examiner, examined Plaintiff and
reviewed her medical records.  (Id. at 2310.)  Dr. Lane concluded that Plaintiff was
"precluded from lifting more than ten pounds, as well as from repetitive cervical motions,
work at or above shoulder, and repetitive pushing and pulling."  (Id. at 2344.)  With
respect to Plaintiff's disability status, Dr. Lane reported that Plaintiff was "permanent and
stationary," and that "maximum medical improvement [had] been achieved."  (Id.)  Dr.
Lane's objective physical findings included decreased range of motion, tenderness,
"[m]uscle guarding with asymmetry," and "[r]adiographic evidence of degenerative disc
changes" in Plaintiff's cervical spine, decreased range of motion, slight decreased rotator
cuff strength, and tenderness in Plaintiff's shoulders.  (Id.)  With respect to Plaintiff's
work restrictions/functional capacity, Dr. Lane determined that Plaintiff was "precluded
from lifting more than 50 pounds,[6] as well as repetitive cervical motions," and should not
work "at or above shoulder level" or do repetitive pushing and pulling.  (Id. at 2345.)

---

[5]  "The Hawkins Test (also known as the Hawkins Kennedy Test) is one of the most common special
tests used in orthopedic physical assessment and examination of the shoulder. . . . The Hawkins
Kennedy test is considered positive if pain is reported in the superior–lateral aspect of the shoulder."
See https://physicaltherapyweb.com/hawkins-kennedy-test-orthopedic-shoulder-examination/
(last visited on August 3, 2023).

[6]  The Court notes that Dr. Lane's reference to "50 pounds" appears to be a typo because he stated in the
same opinion that Plaintiff should not lift more than "10 pounds."  (Id. at 2344.)

**C.    Dr. Epstein**

On June 1, 2017, state agency physician, Dr. Epstein, reviewed Plaintiff's medical records and concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk "6 hours in an 8-hour workday," sit for a total of "6 hours in an 8-hour workday," and that she was not limited in her ability to push and pull.  (Id. at 111–12.)  Dr. Epstein also reported that Plaintiff can occasionally climb ramps and stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl.  (Id. at 112.)  He further stated that Plaintiff was limited to occasional reaching overhead, but she was not otherwise limited in her ability to handle, finger, and feel.  (Id.)  Dr. Epstein also noted that Plaintiff's January 24, 2017, exam showed cervical spine tenderness, slightly decreased range of motion, tender trigger points in the left shoulder, and a positive impingement sign in the right shoulder.  (Id. at 113.)  Additionally, he wrote that Plaintiff's MRIs showed spondylosis of the cervical spine with narrowing, partial rotator cuff tears with bursitis in left shoulder, and cervical spondylosis with stenosis and bilateral upper extremity radiculitis, improvement from 6-month prior shoulder arthroscopy, and partial rotator cuff tear with weakness in right shoulder.  (Id.)  Dr. Epstein opined that Plaintiff had "severe impairments of the spine and joints," and that "Listings 1.02 and 1.04 [we]re not met."  (Id.)

**D.    Dr. Wright**

On May 3, 2018, on reconsideration, state agency physician, Dr. Wright, reviewed Plaintiff's medical records and concluded that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for "6 hours in an 8-hour workday," sit for "6 hours in an 8-hour workday," and that Plaintiff was not limited in her ability to push and pull.  (Id. at 134–36.)  He reported that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl, and that Plaintiff had limited ability to reach overhead.  (Id. at 136.)  Dr. Wright also wrote that Plaintiff had unlimited ability to handle, finger, and feel.  (Id.)  He noted that Plaintiff's January 24, 2017 exam showed cervical spine tenderness and slightly

decreased range of motion, tender trigger points in the left shoulder, and a positive impingement sign in the right shoulder.  (Id. at 135.)  He further stated that Plaintiff's MRIs showed spondylosis of the cervical spine with narrowing, and partial rotator cuff stenosis with bursitis in the left shoulder.  (Id.)  Dr. Wright's assessment was "cervical spondylosis with stenosis and bilateral upper extremity radiculitis (improved)" from prior shoulder arthroscopy, and partial rotator cuff tear with weakness in right shoulder.  (Id.)  Dr. Wright opined that Plaintiff had "severe impairments of the spine and joints," and that "Listings 1.02 and 1.04 [we]re not met."  (Id.)

**E.    Plaintiff's Testimony During Administrative Hearing**

At the administrative hearing on July 30, 2020, Plaintiff testified that she takes Motrin or Tylenol to help with her cervical spine pain, and exercises by swimming for 45 minutes to an hour at least three days per week.  (Id. at 70, 95.)  Plaintiff has not been working, doing housework, doing her hair, or driving much.  (Id. at 95.)  When she drives, she uses a backup camera because she cannot turn her neck without turning her whole body.  (Id.)  She has neck pain when she sits or stands for extended periods of time, and takes Tylenol or Ibuprofen, which usually "take[] care" of her shoulder, neck, and knee "issues."  (Id.)  Plaintiff testified that housework (like vacuuming and sweeping) involves too much repetitive motion, and causes pain in her shoulder and neck. (Id. at 97.)  Her radiculopathy makes her hands go numb and unable to grip things, she can use computer for an hour before needing to lay down due to shoulder and neck pain, and sitting up at a computer causes fatigue.  (Id. at 97–98.)  Plaintiff's daughter does most of the cooking because chopping vegetables causes pain in Plaintiff's shoulder and neck.  (Id. at 98.)  Plaintiff also testified that she is "totally useless" the day after a full day of being active because "everything just hurts."  (Id.)

At the administrative hearing on September 1, 2020, Plaintiff testified that she cannot get wet clothes out of her laundry machine due to pain.  (Id. at 25, 45.)  Her pain forces her to lay down with ice or heat, and she does not reach above the refrigerator. (Id. at 45.)  She can use her computer for about twenty to thirty minutes before needing to

take a break, and can do crafts for about an hour before needing rest due to the repetitive motions.  (Id.)

Plaintiff also testified that she has fluid in her lungs.  (Id. at 46.)  Further, she has difficulties with concentration because of anxiety, and must lay down and take Xanax, at times, to deal with the anxiety.  (Id. at 46–47.)  Plaintiff testified that she "cannot walk any distance."  (Id. at 47.)  She is exhausted after going to the grocery store, which she has done "maybe four or five times in the last seven months."  (Id.)  Plaintiff takes Tylenol because she was advised not to take Motrin due to side effects.  (Id.)

Plaintiff feels like "having extra weight on [her] neck," and the pain sometimes travels to her arms or her back.  (Id. at 48.)  Sitting is difficult and she needs support to get up.  (Id.)  Plaintiff can pay bills online, occasionally watch her grandchildren, and do light gardening for about an hour, but when she tried to do some yardwork, she "ended up on ice for two hours."  (Id. at 49.)  Plaintiff is also losing her memory.  (Id.)

Plaintiff further testified that she has not "had good results with . . . shoulder surgery," stating that "it hurts almost to the point of before the surgery."  (Id. at 50.)  She was recommended for physical therapy, but because her insurance did not fully cover it, she looked up physical therapy treatments online that she could do at home.  (Id.)

Plaintiff fell twice during the week of the hearing.  (Id. at 51.)  She also fell in 2018, and broke her rib, and the fall caused pneumonia that led to fluid built-up in her lungs.  (Id.)  Plaintiff's bone density was tested after she broke her ankle and the findings showed that her "bone density was good."  (Id.)  Plaintiff uses a cane and a knee brace to balance.  (Id.)

Plaintiff further testified that she last worked as an assistant, answering phones, but she was no longer able to perform that job because of the "amount of time sitting down and . . . concentration," and because she could not handle the "quick . . . 30-second decisions," nor the neck pain from trying to cradle the phone.  (Id. at 53–54.)  Additionally, Plaintiff testified that although her shoulder surgeries were beneficial, they did not alleviate her pain.  (Id. at 57.)

**F.**    **Dr. Hansen's Testimony During Plaintiff's Administrative Hearing**

At the July 2020 hearing, medical expert and orthopedic specialist, Dr. Hansen, testified that between May 26, 2016, and the date of the hearing, Plaintiff had "pretty clear-cut development of symptoms from degenerative disc disease." (Id. at 78–79.) He stated that Plaintiff had several "epidural steroid injection[s]" with "some definite improvement each time," her neck gradually got worse, but she continued to "live and function and work." (Id. at 80.) Dr. Hansen further testified that Plaintiff's July 7, 2016 MRI showed that her degenerative disc disease from C4–C7 had "clearly gotten significantly worse." (Id. at 80–81.) He also stated that Plaintiff's neck had "gotten just a bit worse over time," but her chiropractic visits helped, and Plaintiff's symptoms "m[ight] or m[ight] not be manageable without surgery." (Id. at 81.) Dr. Hansen further testified that Plaintiff had been diagnosed with "bilateral rotator cuff impingement syndrome with rotator cuff disease and partial thickness rotator cuff tears." (Id.)

Dr. Hansen also stated that Plaintiff's February 2018 orthopedic examination showed decreased range of motion, slightly decreased rotator cuff strength, and tenderness to palpation. (Id. at 82.) He opined that Plaintiff's partial thickness tear in her shoulder was "enough to equal [Listing] 1.02B,"[7] but stated that he will "accept the fact

---

[7] Listing 1.02B provides, in relevant part:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With: . . .
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B.

that it might be disputed because it's not quite a severe enough problem, but . . . [Plaintiff] has ineffective gross and fine motor activities with reaching anything overhead." (Id. at 83.)  Dr. Hansen further testified that Plaintiff's medical records from "individual examiners, both pain management and . . . surgery" demonstrated that Plaintiff's cervical spine had motor deficits that met Listing 1.04A.[8]  (Id.)  He also stated that findings regarding Plaintiff's "wrist extension weakness, positive Spurling's maneuver, decreased range of motion, and . . . moderate to severe bilateral neuroforaminal stenosis at 5–6," indicated that Listing 1.04A was satisfied.  (Id.)

Additionally, Dr. Hansen testified that Plaintiff was sedentary and should be restricted to only rare overhead reaching because it could damage her shoulder by worsening her rotator cuff disease.  (Id. at 84–85.)  He specified that Plaintiff should not lift more than "a couple pounds," she "can lift a Kleenex box overhead several times a day," but should not lift "heavy files . . . above her shoulder level at all."  (Id. at 85.)  Dr. Hansen further stated that Plaintiff could reach out in front of her from her waist to her shoulder "50% of the time," and could frequently handle, finger, and feel, with certain exceptions because these motions could add "stress on her neck and shoulders."  (Id.)  He also opined that Plaintiff should not frequently carry anything heavier than five pounds."

---

[8]  Listing 1.04A, entitled "Disorders of the spine," provides the following in relevant part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

21cv1403-LR

(<u>Id.</u> at 86.)  Further, Dr. Hansen opined that Plaintiff could balance, bend, stoop, crouch, and operate foot controls occasionally, but should avoid "kneeling and crawling," cold and vibration exposure, and "any kind of respiratory irritants" due to her breathing problems.  (<u>Id.</u>)

The ALJ then questioned Dr. Hansen as follows:

> Well, if I decide to follow your testimony and your opinion, it would result pretty clearly in a favorable decision in the case.
> . . .
>
> [state agency physicians in this case] reviewed, essentially, the same records you did. . . . [A]ll felt this wasn't a listing level case, felt that it was a light exertion case to protect [Plaintiff's] shoulders, which seem to have gotten better, in their view, from the arthroscopic surgeries, with a limitation to overhead reach and some . . . posture limitations, not quite as extreme as you have given.

(<u>Id.</u> at 87.)

Dr. Hansen responded  that he disagreed with the state agency physicians because they "underestimate[d] the impairment."  (<u>Id.</u>)  He explained that he thoroughly reviewed various opinions in Plaintiff's medical record, including the opinions of physicians who are specialists and who treated or examined Plaintiff.  (<u>Id.</u> at 88–89.)  Dr. Hansen specifically noted that Plaintiff's treating physician, Dr. Tallman, listed the same restrictions that he assessed.  (<u>Id.</u> at 89.)  Dr. Hansen further stated that consultative examiner, Dr. Lane, examined Plaintiff and determined that she had the same RFC as he assessed.  (<u>Id.</u> at 87–88.)

## VI.  DISCUSSION

### A.   <u>The ALJ Improperly Evaluated Medical Opinion Evidence</u>

Plaintiff argues that the ALJ erred by failing to properly evaluate the opinion evidence according to regulations, Agency policy, and  Ninth Circuit precedent.  (Pl.'s Mot. at 3, 17–28.)  Specifically, Plaintiff contends that the ALJ improperly discounted consistent opinions of (1) Plaintiff's treating orthopedist, Dr. Tallman, (2) consultative examiner, Dr. Lane, and (3) medical expert, Dr. Hansen, and, instead, the ALJ relied on

the assessments of non-examining state agency medical consultants.  (See id.; Pl.'s Opp'n at 1–5.)  Plaintiff asserts that her treating orthopedist, Dr. Tallman, opined that she cannot perform repetitive tasks with her arms, including overhead reaching, and repetitive neck motions.  (Pl.'s Mot. at 10–11; Pl.'s Opp'n at 1–2 n.1.)  Plaintiff further argues that a consultative examiner, Dr. Lane, opined that she is precluded from performing repetitive cervical motions or work at or above shoulder level, and from repetitive pushing and pulling.  (Pl.'s Mot. at 11; Pl.'s Opp'n at 2 n.1.)  Additionally, Plaintiff contends that a medical expert, Dr. Hansen, testified during the administrative hearing that Plaintiff can lift 5–10 pounds occasionally and 5 pounds frequently, and can rarely reach overhead.  (Pl.'s Mot. at 13; Pl.'s Opp'n at 2 n.1.)  Plaintiff claims that the opinions of Drs. Lane, Tallman, and Hansen agree that she is unable to perform repetitive motions with her arms and neck, and work on tasks involving reaching overhead, but the ALJ did not include the identified limitations in Plaintiff's RFC and did not provide any reasons for excluding those limitations from the RFC.  (Pl.'s Mot. at 18–22.)  Plaintiff also maintains that the ALJ's reliance on normal findings, which contain no direct reference to the actual limitations against jobs involving neck motion and more than rare overhead reaching, was highly selective and not supported by substantial evidence.  (Pl.'s Opp'n at 4–5.)

Defendant argues that the ALJ properly discounted the medical opinion evidence because he provided valid reasons supported by substantial evidence to discount the opinions of Drs. Tallman, Lane, and Hansen regarding Plaintiff's allegedly disabling limitations.  (Def.'s Mot. at 9–14.)  Defendant asserts that the ALJ noted "Dr. Tallman's contention about Plaintiff's limitations regarding her arms and neck, Dr. Lane's contention regarding Plaintiff's neck and shoulders, and Dr. Hansen's contention regarding Plaintiff's lifting and reaching."  (Id. at 11.)  Defendant further claims that the ALJ detailed objective evidence that contradicted the "extreme and drastic" limitations those doctors assessed.  (Id.)  Defendant contends that the regulations require the ALJ to consider a treating relationship, but the ALJ is not required to articulate and explain how each and all factors, indulging the treating relationship, affected the ALJ's evaluation.

1    (Id. at 12 (citing 20 C.F.R. § 404.1527(c)).)  Defendant therefore asks the Court to affirm

2    the ALJ's decision.  (Id. at 14.)

3        **1.  Applicable Law**

4        Under the regulations governing claims filed before March 27, 2017, such as the

5    claim in this case,[9] "[o]pinions from treating physicians receive more weight than

6    opinions from examining physicians, and opinions from examining physicians receive

7    more weight than opinions from non-examining physicians."  Farlow v. Kijakazi, 53

8    F.4th 485, 488 (9th Cir. 2022) (citation omitted).  The opinion of a treating physician is

9    given more weight than opinions of physicians who do not treat the claimant because

10   treating physicians have a greater opportunity to know and observe the claimant.  See

11   Turner v. Comm'r of Soc. Sec., 613 F. 3d 1217, 1222 (9th Cir. 2010); Smolen v. Chater,

12   80 F.3d 1273, 1285 (9th Cir. 1996); 20 C.F.R. § 404.1527(c)(1).

13       If the treating physician's opinion is not contradicted by another physician, it may

14   be rejected only for "clear and convincing" reasons supported by substantial evidence in

15   the record.  Farlow, 53 F.4th at 488; Turner, 613 F. 3d at 1222.  If the treating physician's

16   opinion is contradicted by the opinion of another physician, the ALJ may reject the

17   treating physician's opinion only by providing "specific and legitimate reasons"

18   supported by substantial evidence in the record for doing so.  Turner, 613 F. 3d at 1222.

19   To meet this burden, the ALJ must set out a "detailed and thorough summary of the facts

20   and conflicting clinical evidence, stat[e] [his] interpretation thereof, and mak[e]

21   findings."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); see also Orn v.

22

23   _____

24   [9]  The rule giving deference to a claimant's treating physician does not apply to claims filed on or after

25   March 27, 2017.  See 20 C.F.R. § 416.920c(a) (providing that under the new regulations, for claims filed
     on or after March 27, 2017, the Commissioner "will not defer or give any specific evidentiary weight . . .

26   to any medical opinion(s) . . . including those from [the claimant's] medical sources.").  Instead, certain
     factors are to be considered in evaluating the record as a whole.  See 20 C.F.R. § 416.920c(b)–(c).  In

27   this case, Plaintiff filed her application for disability insurance benefits on January 23, 2017.  (See AR at
     102.)  Accordingly, the changes to the treating physician rule do not apply in this case.

28

<u>Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) (quotation omitted) ("The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

Similarly, an examining physician's opinion must be given greater weight than the opinion of a non-examining physician, and "even if it is contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  <u>Perez v. Saul</u>, 855 F. App'x 365, 366 (9th Cir. 2021) (citation omitted).  Further, when evaluating an opinion of a non-examining, non-treating physician, an ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record."  <u>Farlow</u>, 53 F.4th at 488 (quoting <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1244 (9th Cir. 1998)).  "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician; such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record."  <u>Maye v. Kijakazi</u>, Case No.: 22CV1326-BLM, 2023 WL 4364890, at *3 (S.D. Cal. July 5, 2023) (quoting <u>Townsend v. Colvin</u>, No. SACV 13–402–JEM, 2013 WL 4501476, *6 (C.D. Cal. Aug. 22, 2013)).

Controlling weight is given to a treating source's medical opinion if it is "well-supported by medically acceptable and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  If the treating physician's opinion is not "well supported" or is inconsistent with other substantial evidence in the record, factors including the length of the treatment relationship, the nature of the treatment relationship, supportability, consistency, specialization, and other factors will be considered.  <u>Id.</u> at § 404.1527(c)(2)(i–6).

/ / /

/ / /

/ / /

21cv1403-LR

### 2. Analysis

#### a. Treating physician's opinion—Dr. Tallman

Plaintiff's treating orthopedist, Dr. Tallman, opined that Plaintiff could not perform repetitive tasks with her arms, including overhead reaching, and that she could not perform repetitive neck motions. (AR at 1124 (containing Dr. Tallman's May 2016 report that Plaintiff could perform "limited overhead work"); id. at 1122 (containing Dr. Tallman's April 2018 report that Plaintiff had "a disability . . . precluding repetitive reaching or overhead use of the bilateral arms," and was "precluded [from] . . . any repetitive neck motion"); id. at 1967 (containing Dr. Tallman's February 2018 report that Plaintiff could not perform repetitive tasks with the "bilateral upper extremities including limited overhead reaching.").) Dr. Tallman also found that Plaintiff was "temporarily totally disabled" for purposes of Plaintiff's workers' compensation claim during the period at issue in this case. (See id. at 1111, 1114, 1117, 1594, 1601, 1641, 1643, 1652, 1659, 1662, 1683, 1689.) The agency reviewing physicians found that Plaintiff could reach overhead occasionally, but she was not otherwise limited in her ability to perform repetitive tasks with her arms and neck. (See id. at 111–13, 134–36.) Because Dr. Tallman's opinion was partially contradicted by the agency reviewing physicians, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record to discount Dr. Tallman's opinion. See Turner, 613 F. 3d at 1222 (providing that if the treating physician's opinion is contradicted by the opinion of another physician, the ALJ may reject the treating physician's opinion only by providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so).

The Court initially notes that the ALJ acknowledged in his written decision that "[t]he record [in this case] includes numerous workers' compensation opinions from Dr. Tallman . . . who opined the claimant was unable to work or [was] temporarily totally disabled (TTD) during the period at issue." (AR at 27–28.) The ALJ "g[ave] Dr. Tallman's opinions . . . less weight than opinions rendered under Social Security

disability standards" noting that "[s]tatements that the claimant is disabled or unable to work are statements on issues reserved to the Commissioner."  (Id. at 28.)

"The terms employed in workers' compensation disability rating are not equivalent to Social Security disability terminology."  Bowser v. Comm'r of Soc. Sec., 121 F. App'x 231, 242 (9th Cir. 2005) (citing Desrosiers, 846 F.2d at 576); see also Olivera v. Astrue, Civil No. 09cv1558 JLS (RBB), 2010 WL 5582902, at *15 (S.D. Cal. Nov. 22, 2010) (citation omitted) (noting that "Social Security and workers' compensation claims are not the same," and "[t]he categories of work under the Social Security disability scheme are measured quite differently [from the categories under California's workers' compensation program].").  Although findings in a workers' compensation case are not conclusive in a Social Security case, an ALJ may not ignore a physician's "medical opinion merely because it was issued in a workers' compensation context"; instead, the ALJ is required to evaluate "the objective medical findings contained in such opinions . . . as any other medical opinion."  Bowser, 121 F. App'x at 242 (citation omitted); see also Macri v. Chater, 93 F.3d 540, 543–44 (9th Cir. 1996) (citing Desrosiers, 846 F.2d at 576).  Further, "[t]he ALJ's opinion should reflect . . . that the ALJ properly considered the pertinent distinctions between the two schemes."  Id. (citing Desrosiers, 846 F.2d at 576).  In this case, the ALJ properly noted a difference between a disability finding in the workers' compensation context and one made when deciding eligibility for Social Security benefits, and expressly recognized in his written decision the distinction between Plaintiff's prior workers' compensation case and Plaintiff's claim for disability insurance benefits at issue in this case.  See Desrosiers, 846 F.2d at 576; Bowser, 121 F. App'x at 242.  However, as discussed in detail below, the ALJ did not sufficiently identify specific contradicting medical evidence to justify discounting the weight of the medical opinions of Plaintiff's treating and examining physicians.

With respect to Dr. Tallman's opinions that Plaintiff could not perform repetitive motions with her arms and neck, the ALJ "[found] those opinions vague as to the claimant's upper extremity limitations."  (AR at 28.)  The ALJ gave those opinions

"some weight only to the extent that those opinions [were] consistent with the claimant's assigned sedentary residual functional capacity."  (Id.)  The ALJ further stated that

> Dr. Tallman supported his opinions by noting signs of tenderness and limited range of motion of the cervical spine; and tenderness, slight weakness, positive impingement signs, and reduced range of motion of the bilateral shoulders . . . . However, the claimant also showed normal coordination, normal range of motion of the wrists and fingers, unremarkable posture, mostly normal sensory function, mostly normal strength throughout, normal muscle tone, mostly normal reflexes, intact cranial nerves, normal spasm, deformity, edema, or use of an ambulatory assistive device during objective exams.  In addition, the claimant exhibited normal gait and posture in April, May, and October 2016; and October 2017.

(Id. (citations omitted).)

Although the ALJ cited portions of Dr. Tallman's opinion detailing Plaintiff's reaching and neck limitations, the ALJ then listed normal findings and included a string citation to Plaintiff's medical records containing normal findings, most of which did not relate to Plaintiff's ability to perform repetitive tasks with her arms or neck.  (See id.)  The ALJ did not identify any specific contradicting medical evidence in the record or explain why the opinion of Plaintiff's treating orthopedist, who treated Plaintiff for several years, and examined her almost every month during the relevant period of time, was entitled to less weight.  See Tommasetti, 533 F.3d at 1041 (providing that the ALJ is required to set out a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] [his] interpretation thereof, and mak[e] findings."); Orn, 495 F.3d at 632 (requiring the ALJ to "set forth his own interpretations and explain why they, rather than the [treating physician's], are correct"); see also Kreischer v. Berryhill, Case No.: 3:18-cv-01034-W (RNB), 2019 WL 2177916, at *5 (S.D. Cal. May 20, 2019) ("[I]t is not the Court's function to comb the record to find specific conflicts when the ALJ [fails to specify the evidence that allegedly undermines the treating physician's opinion]," where "the treatment records referenced by the ALJ consist[ed] of hundreds of pages of documents") (citing Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015)).

Notably, as discussed below, Dr. Tallman's opinion concerning Plaintiff's limitations was consistent with the opinions of Social Security consultative examiner, Dr. Lane, and medical expert who testified at Plaintiff's administrative hearing, Dr. Hansen. To the extent the ALJ relied on the findings of non-examining, non-treating agency physicians, "[t]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician[.]" Maye, 2023 WL 4364890, at *3. The ALJ's selective medical record citation and conclusory finding does not set forth the requisite specific and legitimate reasons that are supported by substantial evidence for discounting Dr. Tallman's opinion. See Deanna R. v. Saul, Case No.: 19-CV-1358 W (RBB), 2020 WL 3496852, at *4 (S.D. Cal. June 29, 2020) (concluding that the ALJ's citation of "normal findings" and "the state physicians' opinions based thereon d[id] not constitute substantial evidence" to discount the opinions of plaintiff's treating physicians); Kovach v. Berryhill, Case No.: 3:18-cv-01848-GPC-BLM, 2019 WL 4745036, at *9 (S.D. Cal. Sept. 30, 2019) ("[T]he ALJ's selective citation of normal clinical findings in light of substantial evidence to the contrary is unavailing as a legally sufficient reason to discount a treating physician's opinion."); Felipe v. Colvin, No. 1:13–cv–01744–SKO, 2015 WL 692066, at *10 (E.D. Cal. Feb. 18, 2015) (finding that the ALJ's reason to discount plaintiff's physician's opinion based on isolated "normal . . . findings during the course of treatment [wa]s not specific and legitimate.").

Additionally, the ALJ neither mentioned the factors listed in 20 C.F.R. § 404.1527(c)(2), nor indicated that he considered them in his decision to discount Dr. Tallman's opinion. See 20 C.F.R. § 404.1527(c)(2) (providing that "[u]nless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."); Trevizo v. Berryhill, 871 F.3d 664, 676 (9th Cir. 2017) (failing to "consider factors such as length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship or the supportability of

the opinion . . . constitutes reversible legal error."); <u>Knealy P. v. Kijakazi</u>, Case No.: 20-cv-0984-AJB-BGS, 2022 WL 563237, at *12 (S.D. Cal. Feb. 24, 2022) (holding that while the ALJ is not "required to expressly address each individual factor," he must show "some indication that [he] considered" the factors), <u>report and recommendation adopted</u>, 2022 WL 827119 (S.D. Cal. Mar. 18, 2022).  Given the length of Dr. Tallman's treatment relationship, his frequent examinations of Plaintiff, as well as his extensive findings on examination, the ALJ's conclusory finding does not set forth the requisite specific and legitimate reasons that are supported by substantial evidence for discounting Dr. Tallman's opinion.

For the reasons stated above, the Court finds that the ALJ did not provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Tallman's opinion.  The ALJ therefore failed to properly evaluate Dr. Tallman's opinion.

### b.  Consultative examiner's opinion—Dr. Lane

On February 26, 2018, Social Security Administration's consultative medical examiner, Dr. Lane, examined Plaintiff and opined that Plaintiff was "precluded from lifting more than ten pounds, as well as from repetitive cervical motions, work at or above shoulder level, and repetitive pushing and pulling."  (AR at 2344–45.)  The ALJ assigned "little weight" to Dr. Lane's opinion, stating that "[w]hile Dr. Lane supported his opinions with a mostly unremarkable objective physical status exam," Dr. Lane's "opinions that the claimant could perform a reduced range of medium work are inconsistent with the overall record."  (Id. at 27.)  The ALJ further stated that "the claimant showed tenderness and limited range of motion of the cervical spine; tenderness, weakness, positive impingement signs, and reduced range of motion of the bilateral shoulders; trace tingling and weakness in bilateral hands; signs of obesity; and antalgic gait on a few occasions in 2016."  (Id.)

After examining Plaintiff and reviewing her medical records, Dr. Lane opined about Plaintiff's limitations.  The Court notes that Dr. Lane's assessed limitations are consistent with the limitations assessed by Plaintiff's treating orthopedist, Dr. Tallman,

who determined that Plaintiff was unable to perform repetitive motions with her arms,
including overhead reaching, and repetitive neck motions.  (See id. at 1122, 1124, 1967.)
Just as the ALJ did during his analysis of Dr. Tallman's opinion, the ALJ discounted Dr.
Lane's opinion by citing normal findings, most of which did not relate to Plaintiff's
ability to perform repetitive motions with her arms or neck.  The ALJ did not offer any
conflicting evidence to challenge Dr. Lane's findings, and the ALJ's conclusory finding
does not provide specific and legitimate reasons supported by substantial evidence for
discounting Dr. Lane's opinion.  See Farlow, 53 F.4th at 488 ("[O]pinions from
examining physicians receive more weight than opinions from non-examining
physicians."); Perez, 855 F. App'x at 366 ("[T]he opinion of an examining doctor, even if
contradicted by another doctor, can only be rejected for specific and legitimate reasons
that are supported by substantial evidence in the record.").  The ALJ therefore did not
properly evaluate Dr. Lane's opinion.

### c. Medical expert's opinion—Dr. Hansen

Impartial medical expert and orthopedic specialist, Dr. Hansen, testified at
Plaintiff's July 30, 2020 administrative hearing, and opined that Plaintiff could lift five
two ten pounds occasionally and five pounds frequently, and that Plaintiff was limited in
her overhead reaching.  (AR at 85–86.)  He also opined that Plaintiff's partial tear in her
shoulder satisfied Listing 1.02B, she had "ineffective . . . fine motor [ability] with
reaching anything overhead," motor deficit in her cervical spine which was enough to
satisfy Listing 1.04A, and her wrist weakness, positive Spurling's test, decreased range of
motion, and stenosis satisfied Listing 1.04A.  (Id. at 83.)  Dr. Hansen concluded that
Plaintiff could rarely reach overhead, and could not "lift anything more than a couple
pounds" or carry more than five pounds.  (Id. at 84–86.)

The ALJ assigned little weight to Dr. Hansen's opinions, reasoning that although
"Dr. Hansen reviewed the claimant's medical record and supported his opinions with
references to certain objective evidence, his opinions [were] overly restrictive and

inconsistent with the objective medical evidence considered over time and in its entirety."

(Id. at 27.)  The ALJ then stated the following:

> [T]he claimant demonstrated normal coordination, normal range of motion
> of the wrists and fingers, unremarkable posture, mostly normal sensory
> function, mostly normal strength throughout, normal muscle tone, mostly
> normal reflexes, intact cranial nerves, normal cardiovascular deformity,
> edema, or use of an ambulatory assistive device.  During objective exams in
> April, May, and October 2016; and October 2017, the clamant exhibited
> normal gait and posture.

(Id. (citations omitted).)  Based on these findings, the ALJ concluded that the opinions of state agency consultants were more "persuasive."  (Id.)

An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record."  Farlow, 53 F.4th at 488; see also Davis v. Astrue, 444 F. App'x 151, 15253 (9th Cir. 2011) (reversing where ALJ failed to provide legally adequate reasons for rejecting opinion of the medical expert ).  The ALJ again listed normal findings and included a string citation to Plaintiff's medical records containing normal findings, but did not identify and discuss any conflicting evidence that undermines Dr. Hansen's findings.  The ALJ's conclusion is particularly troubling in light of Dr. Hansen's testimony during Plaintiff's administrative hearing that his opinions were consistent with the opinions of Plaintiff's treating physician, Dr. Tallman, who listed the same restrictions that Dr. Hansen assessed, and consultative examiner, Dr. Lane, who assessed the same RFC as he assessed.  (AR at 87–89.)  The Court therefore finds that the ALJ did not properly evaluate Dr. Hansen's opinion.

### d.  Conclusion

Plaintiff's treating orthopedist, Dr. Tallman, Social Security consultative examiner, Dr. Lane, and medical expert selected to testify at Plaintiff's administrative hearing, Dr. Hansen, all opined that Plaintiff could not perform repetitive motions with her arms, including overhead reaching, and repetitive motions with her neck.  Although the ALJ's assessed RFC limited Plaintiff to "no more than occasional overhead reaching," the RFC

did not include the additional restrictions assessed by Drs. Tallman, Lane, and Hansen regarding Plaintiff's ability to perform tasks involving repetitive arm and neck motions, and the ALJ ultimately concluded that Plaintiff could perform her past relevant work. The ALJ erred by discounting opinions of Drs. Tallman, Lane, and Hansen, and, based on the record before it, the Court cannot conclude that the error was harmless.  See Tommasetti, 533 F.3d at 1038 ("[H]armless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination") (internal quotation marks and citation omitted); Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007) (providing that errors that do not affect the ultimate result are harmless); see also Chad B. v. Kijakazi, Case No.: 20cv1431-CAB(MSB), 2021 WL 5564496, at *10 (S.D. Cal. Nov. 29, 2021) (finding that the error was not harmless, where the ALJ failed to properly consider plaintiff's manipulative limitations when assessing plaintiff's RFC, and it was unclear "how the VE would have testified had more restrictive limitations been included in the hypotheticals posed to the VE."); Godfrey v. Saul, Case No.: 20-CV-917-WVG, 2021 WL 3810561, at *17 (S.D. Cal. Aug. 26, 2021) (finding that the ALJ's error was not harmless and remand for further consideration was appropriate, where the ALJ "might re-evaluate the RFC in its entirety.").

**B.**   **The ALJ Properly Evaluated Plaintiff's Subjective Symptom Testimony**

Plaintiff contends that the ALJ improperly discounted her subjective symptom testimony because the ALJ did not consider her "stellar" forty-four year work history. (Pl.'s Mot. at 28–30 (citing 20 C.F.R. § 404.1529(c)(3); Social Security Rulings 96-8p & 16-3p); Pl's Opp'n at 5).)  Defendant argues that the ALJ is not required to articulate how Plaintiff's work history factored into the ALJ's decision.  (Def.'s Mot. at 17.)

### 1.  Applicable Law

20 C.F.R. § 404.1529(c)(3) provides the following with respect to the ALJ's consideration of claimant's prior work record: "because symptoms, such as pain, are subjective and difficult to quantify" the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about the

claimant's symptoms, evidence submitted by the claimant's medical sources, and observations by the Agency's employees and other persons.  Id.  Further, Social Security Ruling ("SSR") 16-3p, which applies to disability applications heard by the Agency on or after March 28, 2016,[10] emphasizes that "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017).  SSR 16-3p clarified that the intensity and persistence of the claimant's symptoms are evaluated to "determine how symptoms limit ability to perform work-related activities."  Id.; see also Trevizo, 871 F.3d at 679 n.5 (noting that the SSR 16-3p "makes clear" that "assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms . . . and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'").

## 2. Analysis

The ALJ stated in his written decision that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p."  (AR at 23.)  The ALJ is not required to engage in "a full-blown written analysis of all the regulatory factors."  Hernando P. v. Comm'r of Soc. Sec., Case No.: 20cv875-MSB, 2021 WL 4059869, at *9 (S.D. Cal. Sept. 3, 2021) (quoting Hoffman v. Berryhill, Case No.: 16-cv-1976-JM-AGS, 2017 WL 3641881, at *4

---

[10]  Specifically, the SSR 16-3p provides the following, in relevant part:

> [O]ur adjudicators will apply SSR 16-3p when we make determinations and decisions on or after March 28, 2016.  When a Federal court reviews our final decision in a claim, . . . we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review.  If a court remands a claim for further proceedings after the applicable date of the ruling (March 28, 2016), we will apply SSR 16-3p to the entire period in the decision we make after the court's remand.

SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017).

(S.D. Cal. Aug. 24, 2017)); see also Yantos v. Berryhill, Case No.: 15cv02733 JAH-BGS, 2018 WL 899126, at *6 (S.D. Cal. Feb. 14, 2018) ("[T]he regulations and rulings contain no requirement that each and every factor be specifically analyzed in an ALJ's decision.").

In this case, the ALJ stated in his written decision that he considered factors listed in 20 C.F.R. § 404.1529 and specified his reasons for discounting Plaintiff's subjective symptom testimony.  (See AR at 23–26).  The Court also notes that during the administrative hearing, the ALJ stated that he looked at Plaintiff's work history report. (Id. at 53.)  Additionally, during the administrative hearing, the ALJ had a lengthy discussion with Plaintiff about her past work history.  (See id. at 52–54.)  Further, the ALJ discussed Plaintiff's past work history with the VE.  (See id. at 58–61.) Accordingly, although the ALJ did not explicitly discuss Plaintiff's work history in his written decision, the ALJ clearly considered it.

Therefore, because the ALJ considered claimant's work history and was not required to explicitly analyze Plaintiff's work history in his written opinion, the ALJ did not commit legal error.  See 20 C.F.R. § 404.1529(c)(3); see also Yantos, 2018 WL 899126, at *6 (finding that the ALJ did not err by failing to explicitly analyze plaintiff's work history; reasoning that  "[a]lthough the ALJ must consider a broad spectrum of evidence, including prior work record, an ALJ is not required to include a discussion of a claimant's work history in his or her determination."); Soto v. Berryhill, Case No.: 3:17-cv-1584-BEN (RNB), 2018 WL 4599758, at *6 (S.D. Cal. Sept. 25, 2018) (while "the ALJ is required to consider a claimant's work history," the ALJ is not required to "specifically mention a claimant's 'strong work history' in his/her assessment").

/ / /

/ / /

/ / /

/ / /

/ / /

21cv1403-LR

## VII.  REMEDY

Plaintiff moves the Court to reverse the Commissioner's decision and remand the case for further proceedings.  (Pl.'s Mot. at 27–28, 30; Pl.'s Reply at 5.)  Defendant asks the Court to affirm the Commissioner's decision, or, if the Court finds reversible error, to remand for further proceedings.  (Def.'s Mot. at 14, 18.)

The reviewing court may enter a judgment "affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  Id.  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds that the ALJ improperly discounted opinions of Plaintiff's treating orthopedist, Dr. Tallman, consultative examiner, Dr. Lane, and medical expert, Dr. Hansen.  The Court also finds that further administrative proceedings will allow the ALJ to properly consider the opinions of Drs. Tallman, Lane, and Hansen regarding Plaintiff's limitations, as well as how those opinions impact Plaintiff's RFC and alleged disability.  Accordingly, remand for additional proceedings is appropriate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

21cv1403-LR

# VIII.  CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment [ECF No. 13] and **DENIES** Defendant's Cross-Motion for Summary Judgment [ECF No. 14].  The case is **REMANDED** for further proceedings to address the errors noted in this Order.

**IT IS SO ORDERED.**

Dated:  August 30, 2023

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

21cv1403-LR